UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DONALD E. WEAVER, JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:19-cv-01950-SEB-DLP |
| | ) |
| WEXFORD HEALTH SOURCES, INC., | ) |
| PAUL TALBOT, | ) |
| | ) |
| Defendants. | ) |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT,
DENYING PLAINTIFF'S MOTION TO CORRECT RESPONSE,
AND DIRECTING FINAL JUDGMENT**

On March 5, 2019, the Court severed misjoined claims[1] from Plaintiff Donald Weaver's complaint filed on February 22, 2019. *See* dkt. 1; dkt. 2. This action concerns Mr. Weaver's claims related to his allegations that he was denied or delayed medical care by the defendants after March 1, 2017, once he was transferred to Pendleton Correctional Facility ("PCF"). Dkt. 8 at 2 (screening entry). Mr. Weaver alleges that he was experiencing pain in his throat, mouth, and chest and was diagnosed with ptotic epiglottis and chronic tonsillitis, had not received a tonsillectomy at the time of his complaint, and that Dr. Talbot failed to treat him for his condition until August 22, 2018. *Id.* at 3. He further alleges that Wexford Health Sources, Inc. ("Wexford") failed to train Dr. Talbot to adequately treat his medical condition and has a custom or practice of failing to diagnose and

---

[1] Mr. Weaver alleged that he was denied constitutionally adequate medical care while incarcerated at Wabash Valley Correctional Facility between November 22, 2013, until he was transferred to Pendleton Correctional Facility on March 1, 2017. Dkt. 2. This Court granted summary judgment in favor of the defendants on March 23, 2021. *See Weaver v. Correctional Med. Servs., Inc., et al.*, No. 1:19-cv-00799-TWP-DLP, at dockets 91 and 92.

treat inmates, provide access to care, and of failing to train the physician defendants to diagnose and treat pain and serious medical conditions. *Id.*

The Court screened Mr. Weaver's complaint on July 19, 2019, and the following claims proceed: (1) an Eighth Amendment deliberate indifference claim against Dr. Talbot; (2) an Eighth Amendment policy or practice claim against Wexford; and (3) a breach of contract claim against Wexford. *Id.* at 4.

On August 19, 2020, the defendants moved for summary judgment. Dkt. 35. Mr. Weaver filed his response in opposition on October 26, 2020. Dkt. 44. The defendants filed their reply on November 4, 2020. Dkt. 46. The motion is now ripe for the Court's resolution.

For the reasons explained below, the defendants' motion for summary judgment, dkt. [35], is **granted**.

## I. Standard of Review

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a

movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome-determinative. *Montgomery v. Am. Airlines Inc.*, 626 F.3d 382, 389 (7th Cir. 2010). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trs. of Ind. Univ.,* 870 F.3d 562, 573-74 (7th Cir. 2017). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II. Material Facts

Mr. Weaver is an IDOC inmate, and at all times relevant to his claims in this action, he was housed at PCF. Mr. Weaver was transferred to PCF from Wabash Valley Correctional Facility on March 1, 2017. Dkt. 37-3 at 8. Dr. Talbot is a physician licensed to practice in the State of Indiana, and at all relevant times, was employed by Wexford at PCF. Dkt. 37-1, ¶¶ 1-2 (Talbot's Affidavit). Wexford became the IDOC's provider of medical care on April 1, 2017. Dkt. 37-2 at 102-118. Prior to April 1, 2017, Corizon had been the medical provider for the IDOC.

Dr. Talbot provided medical treatment for Mr. Weaver from March 2017 to November 2019. Dkt. 37-1, ¶ 3. On March 22, 2017, Mr. Weaver was evaluated by an outside provider, Dr. Warrick, an ear, nose, and throat specialist ("ENT"), who conducted a laryngoscopy.[2] *Id.*, ¶ 6. The next day, Dr. Talbot received Dr. Warrick's notes that "indicated that Mr. Weaver had chronic tonsillitis." *Id.* Based upon the specialist's findings, Dr. Talbot submitted an Outpatient Referral ("OPR") for Mr. Weaver to be assessed for a tonsillectomy. *Id.*; *see also* dkt. 37-2 at 1-6 (medical records). Dr. Byrd had previously submitted the OPR for Mr. Weaver to see Dr. Warrick. *Id.*

Dr. Talbot saw Mr. Weaver on March 27, 2017, shortly after he had seen the ENT. Dkt. 37-1, ¶ 8; dkt. 37-2 at 7-9. Dr. Talbot discussed other medical concerns with Mr. Weaver along with his complaints of difficulty swallowing, and Mr. Weaver was made aware that Dr. Talbot had submitted an OPR for a tonsillectomy evaluation but was waiting to get a response. *Id.*

---

[2] "A laryngoscopy is an examination of the larynx through the use of a thin, flexible camera. The examination allows for a close-up view of the vocal folds and glottis." Dkt. 37-1, ¶ 35.

On April 29, 2017, Dr. Talbot again treated Mr. Weaver for "hypertension, GERD, suspected chronic tonsillitis, and suspected Glottic Dysphagia.[3]" Dkt. 37-1, ¶ 5; dkt. 37-2 at 10-13. The medical notes indicated that Mr. Weaver's acid reflux, ("GERD"), was "relieved with Zantac," and that his issues of chronic tonsillitis and suspected glottic dysphagia were "currently in management with ENT." Dkt. 37-2 at 10. Dr. Talbot prescribed Zantac for management of GERD. Dkt. 37-1, ¶ 9; dkt. 37-2 at 13.

On June 27, 2017, Mr. Weaver received an off-site video fluoro swallow study ("VFSS") which is "designed to evaluate what happens when a patient swallows food." Dkt. 37-1, ¶ 13. The VFSS tests "for aspiration (food entering the airway instead of the stomach), checks which parts of the mouth or throat do not work well, and determines if certain positions or strategies help the patient swallow better." *Id.* Mr. Weaver's results were normal, did not indicate aspiration, and indicated that he could swallow adequately. *Id.*; dkt. 37-2 at 14-15 (nurse visit after offsite trip); dkt. 45-4 (VFSS Report noting lack of findings).

According to Dr. Talbot's recollection and the medical records, Dr. Talbot consulted with Dr. Warrick on July 19, 2017, and entered his notes after the phone conversation. Dkt. 37-1, ¶ 14; dkt. 37-2 at 16-18. The consult included Mr. Weaver's fiberoptic laryngoscopy results from March 22, 2017, that were "normal except it revealed Mr. Weaver's ptotic epiglottis was touching the poster pharyngeal wall." *Id.* Because of this finding, Dr. Warrick wanted to conduct the VFSS test on June 27, 2017, which rendered normal results. *Id.* Dr. Talbot attested that given these test results, he asked Dr. Warrick whether a tonsillectomy and laser-induced modification of the ptotic epiglottis was indicated and needed. *Id.* Dr. Talbot attested that Dr. Warrick's "response was that

---

[3] "Glottic Dysphagia is a medical condition whereby the larynx does not close tightly when the patient swallows. Further, the pharynx does not adequately move the food to the esophagus while swallowing." Dkt. 37-1, ¶ 10.

it was not indicated at the time, but if Mr. Weaver experienced persistent tonsillar stones then a tonsillectomy could be indicated" and first recommended that Mr. Weaver's GERD be managed. *Id.* Dr. Talbot then scheduled a provider visit with Mr. Weaver to communicate his care plan. *Id.* Dr. Talbot's notes stated that Mr. Weaver was not present during his telephone call with Dr. Warrick. Dkt. 37-2 at 16. In relevant part, the medical chart update stated:

> 1. Laser-induced modification of the ptotic glottis to minimize posterior pharyngeal contact and perhaps the globus sensation the patient complained about, and
>
> 2. Tonsillectomy but only if there is evidence of persisting tonsillar stones which the specialist felt could be the case based on the historic information provided to [Dr. Warrick] in 3-2017 but apparently not present on that exam.
>
> Based on today's telephone conversation this specialist was reluctant to do either of these procedures during today's conversation. In fact he advised control of GERD symptoms which we are . . . currently doing.

*Id.*

Dr. Talbot saw Mr. Weaver on July 27, 2017 for a chronic care visit in which he complained of difficulty swallowing. Dkt. 37-1, ¶ 15; dkt. 37-2 at 19-24. Dr. Talbot reviewed the VFSS results with Mr. Weaver, examined him for tonsillar stones but did not find any, and discussed the management of his GERD. *Id.* Dr. Talbot explained the next step of a "three-month trial of Proton Pump Inhibitor ("PPI")," and after this, his symptoms would be re-evaluated. *Id.* Dr. Talbot submitted a Formulary Exception Request ("FER") for Prilosec 20 mg, a PPI. *Id.* The medical notes indicated the ENT was consulted "recently and they did not feel that either laser treatment of [Mr. Weaver's] epiglottis or tonsillectomy was justified at this time when risks and benefits were carefully weighed. [T]hey encouraged instead treatment of his [GERD]." Dkt. 37-2 at 19, 23. Mr. Weaver testified that he changed his eating habits between 2008 and 2017 to not eat spicy food and to watch sodium intake, but he did not think the medications had much effect. Dkt. 37-4 at 17.

6

On October 12, 2017, Mr. Weaver saw a nurse practitioner for a chronic care visit and reported "slight improvement while on Prilosec," "and that he [thought] Pepcid is not helping due to the dosage being less than that of zantac," but this was while he was out of Prilosec. Dkt. 37-2 at 25-30. The treatment plan was to re-evaluate in 90 days and "if no change or worsening of symptoms consider refer[r]al back to ENT." *Id.* at 28. The nurse practitioner noted that laser treatment of Mr. Weaver's epiglottis and a tonsillectomy were both deferred for GERD treatment, and his "GERD symptoms [were] controlled with Prilosec and zantac combination but not so much on Pepcid." *Id.* at 30. Dr. Talbot communicated with the nurse practitioner about her findings, and the providers agreed to continue Prilosec for 90 days and then re-evaluate a referral to Dr. Warrick. Dkt. 37-1, ¶ 17. Dr. Talbot also submitted a FER for Prilosec and Zantac. *Id.*

Dr. Talbot treated Mr. Weaver on January 17, 2018, at a chronic care visit, and Mr. Weaver indicated his GERD was managed with medication. *Id.*, ¶ 18; dkt. 37-2 at 32-42. Mr. Weaver indicated his GERD was improving with Pepcid but reported a chronic cough that he did not feel was related to his GERD. Dkt. 37-1, ¶ 18; dkt. 37-2 at 32-42. Dr. Talbot reviewed Mr. Weaver's past x-rays, his past PPD test, and labs in his medical records to assess his cough, conducted an exam, and believed it to be seasonal allergies. *Id.* Dr. Talbot prescribed Zyrtec, an antihistamine, for seasonal allergies, noted a possible need for a pulmonary function test ("PFT"), and a need for a chest x-ray follow-up. *Id.* Dr. Talbot started to provide a nebulizer treatment during the visit but due to mandatory count at the facility, it was not fully completed. *Id.* Dr. Talbot noted that it was "unclear" if Mr. Weaver had a respiratory allergy to Prilosec, which, while rare, is possible as is the development of an upper respiratory infection or cough. *Id.* Dr. Talbot prescribed Pepcid to manage GERD at this visit. *Id.*

Dr. Talbot ordered two chest x-rays as a follow-up to the January 17, 2018, visit to monitor Mr. Weaver's complaints of difficulty swallowing and persistent cough. Dkt. 37-1, ¶ 19; dkt. 37-2 at 38. Dr. Talbot also submitted an OPR for Mr. Weaver to see Dr. Warrick regarding his difficulty swallowing. Dkt. 37-1; ¶ 20; dkt. 37-2 at 39-41. Dr. Talbot submitted an OPR for Mr. Weaver to have a PFT in relation to a hypersensitivity to a substance and an OPR for an esophageal pH probe test for GERD. Dkt. 37-1, ¶ 21-22; dkt. 37-2 at 42-48.

Dr. Talbot treated Mr. Weaver again on June 8, 2018, and during this visit, Mr. Weaver wanted surgery for ptotic epiglottis. Dkt. 37-1, ¶ 25; dkt. 37-2 at 48-54. Dr. Talbot noted that OPRs had been submitted for Mr. Weaver to be evaluated by Dr. Warrick. *Id.* He discontinued Mr. Weaver's Metoprolol and ordered that Mr. Weaver's blood pressure and pulse be checked every week for four weeks. *Id.* Dr. Talbot attested that he discontinued Metoprolol because a possible side effect of the medication includes shortness of breath, cough, and wheezing, like Mr. Weaver's reported complaints. Dkt. 37-1, ¶ 26; dkt. 37-2 at 48-54. Dr. Talbot noted that Mr. Weaver's high blood pressure was still being treated with Norvasc and Cozaar, which would not typically carry the same side effects. *Id.* He additionally submitted an OPR for Mr. Weaver to be seen by Dr. Warrick for his ptotic epiglottis. Dkt. 37-1, ¶ 27; dkt. 37-2 at 48-54.

On August 22, 2018, Dr. Warrick performed laser surgery to treat Mr. Weaver for his ptotic epiglottis. Dkt. 37-1, ¶ 28; dkt. 37-2 at 55-62. After his surgery, Mr. Weaver remained in the facility's medical unit for observation. Dkt. 37-1, ¶ 29; dkt. 37-2 at 55-62. Mr. Weaver was scheduled for a one-week follow-up with Dr. Warrick post-surgery, and Dr. Talbot further submitted an OPR for a one-month follow-up. Dkt. 37-1, ¶ 30; dkt. 37-2 at 55-61.

At an appointment the day after Mr. Weaver's surgery, Dr. Talbot told Mr. Weaver that he was approved for a pureed diet for a week and prescribed Tramadol for his post-operative pain.

Dkt. 37-1, ¶ 31; dkt. 37-2 at 62-65. Mr. Weaver was discharged back to his regular housing assignment. *Id.* Mr. Weaver attended his one-week follow-up with Dr. Warrick on August 29, 2018. Dkt. 37-1, ¶ 33; dkt. 37-2 at 66-68.

On September 7, 2018, Dr. Talbot treated Mr. Weaver and explained that the purpose of the laser surgery was to reshape his epiglottis "so that it now had an airtight seal," and that Dr. Warrick did not believe that he was a candidate for a tonsillectomy. Dkt. 37-1, ¶ 34; dkt. 37-2 at 69-72. Mr. Weaver's pureed diet was continued for an additional week, and there was no indication that a liquid diet was necessary. *Id.*

On October 9, 2018, Mr. Weaver received an off-site laryngoscopy to attain a "close-up view of the vocal folds and glottis." Dkt. 37-1, ¶ 35; dkt. 37-2 at 73-78. Then, Dr. Warrick recommended that Mr. Weaver have a CT scan of his neck to exclude other causes of his symptoms. Dkt. 37-1, ¶ 36; dkt. 37-2 at 73-78. Dr. Talbot submitted an OPR for the CT scan on October 15, 2018, in response to the recommendation. *Id.* Mr. Weaver received the off-site CT scan on November 7, 2018. Dkt. 37-1, ¶ 38; dkt. 37-2 at 79-81.

On November 30, 2018, Mr. Weaver saw a nurse practitioner who discussed his CT results and ordered a PFT due to Mr. Weaver's complaint of shortness of breath. Dkt. 37-1, ¶ 39; dkt. 37-2 at 82-85. Mr. Weaver had the PFT on December 3, 2018, which showed that he had "[n]ormal ventilatory function" and "no significant bronchodilator response." Dkt. 37-2 at 86. This test ruled out that asthma was the cause of his symptoms. Dkt. 37-1, ¶ 40. On December 28, 2018, Dr. Talbot treated him for throat issues and told Mr. Weaver that his CT scan results "revealed bilateral palatine tonsilliths and further demonstrated a prominence of Waldeyer's ring.[4]" *Id.*, ¶ 41; dkt. 37-

---

[4] "Prominence of Waldeyer's ring simply indicates tonsillitis." Dkt. 37-1, ¶ 42. "Palatine tonsilliths (a/k/a tonsil stones) describe a lump of calcified materials in the tonsils that form in the crypts . . .

9

2 at 87-93. Mr. Weaver presented with difficulty breathing when he inhaled cold air or when he eats or drinks, and he reported a chronic sore throat; to address these symptoms, Dr. Talbot prescribed Azithromycin, an antibiotic to treat chest, nose, and throat infections. Dkt. 37-1, ¶ 41; dkt. 37-2 at 87-93. He also submitted an OPR for Mr. Weaver to receive a tonsillectomy. *Id.*

Dr. Talbot saw Mr. Weaver on February 11, 2019, "to acquire additional information for Mr. Weaver's potential referral to Dr. Warrick to re-evaluate the need for a tonsillectomy." Dkt. 37-1, ¶ 44, dkt. 37-2 at 94-102. Mr. Weaver reported that the antibiotic made some improvement to his condition, and Dr. Talbot examined his mouth, nose, throat, and tonsils, which appeared to be normal. *Id.* He submitted a follow-up OPR for Mr. Weaver to see Dr. Warrick. *Id.*

Mr. Weaver testified that after the laser surgery for his ptotic epiglottis, he was "basically normal." Dkt. 37-3 at 50. He was still taking medication post-surgery for his blood pressure and GERD. Dkt. 37-4 at 30.

### III. Discussion

**A. Deliberate Indifference Claim Against Dr. Talbot**

At all times relevant to Mr. Weaver's claims, he was a convicted inmate. This means that the Eighth Amendment applies to his deliberate indifference claims. *Estate of Clark v. Walker*, 865 F.3d 544, 546, n.1 (7th Cir. 2017) ("the Eighth Amendment applies to convicted prisoners"). To prevail on an Eighth Amendment deliberate indifference claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed but disregarded that risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Walker v. Wexford Health Sources, Inc.*, 940

---

. Typically, tonsil stones do not require medical treatment and can be resolved by gargling salt water to clear the crypts of any debris." *Id.*, ¶ 43.

F.3d 954, 964 (7th Cir. 2019); *Petties v. Carter,* 836 F.3d 722, 728 (7th Cir. 2016); *Pittman ex rel. Hamilton v. Cty. of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014); *Arnett v. Webster,* 658 F.3d 742, 750-51 (7th Cir. 2011).

"A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir. 2014). The "subjective standard requires more than negligence and it approaches intentional wrongdoing." *Holloway v. Del. Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012).

Mr. Weaver does not have a constitutional right to demand specific medications or treatment. *Arnett,* 658 F.3d at 754 ("[A]n inmate is not entitled to demand specific care and is not entitled to the best care possible…." Rather, inmates are entitled to "reasonable measures to meet a substantial risk of serious harm.").

"A medical professional is entitled to a deference in treatment decisions unless no minimally competent professional would have [recommended the same] under the circumstances." *Pyles*, 771 F.3d at 409. "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.* (internal citation omitted).

The defendants concede that Mr. Weaver's condition of ptotic epiglottis "satisfied the objective component of the deliberate indifference standard." Dkt. 36 at 16. They dispute whether Dr. Talbot was deliberately indifferent. *Id.* Specifically, the defendants argue that Dr. Talbot was entitled to deference to his medical judgment, took endeavors to determine the cause of Mr. Weaver's presented symptoms, and was able to defer to an outside specialist's recommendations. *Id.*

In his response, Mr. Weaver argues that Dr. Talbot did not tell Dr. Warrick about his medication for GERD[5] and kept giving him excuses and medications he was already taking or had taken in the past, and thus, delayed his treatment by the specialist. Dkt. 44 at 1-2. Mr. Weaver claims that he continued to have pain and swallowing difficulty, breathlessness, choking, and "tumors"[6] that formed in his throat, and Dr. Talbot delayed his treatment of surgical intervention by the specialist. *Id.* at 2. Mr. Weaver argues that Dr. Talbot persisted in a course of treatment he knew to be ineffective. *Id.* at 5. In his deposition, Mr. Weaver testified that Dr. Talbot would not recommend surgery "because the specialist gets their money by cutting on people" and that there was nothing wrong with him and his barium test was normal. Dkt. 37-3 at 33, 48. He stated that Dr. Warrick told him that he needed the procedure, and if he was not incarcerated,[7] he would have done it immediately, but the Court notes that Mr. Weaver admitted that he was not present during the consultation between Dr. Warrick and Dr. Talbot after the results of the VFSS test. Dkt. 37-4 at 21-23. Thus, Mr. Weaver did not know the contents of the conversation between the physician and specialist or any discussions regarding GERD or additional alternative treatments prior to

---

[5] In his deposition, Mr. Weaver's testimony was inconsistent, as he testified that Dr. Talbot took it upon himself "to let the doctor know that I had acid reflux." Dkt. 37-3 at 64-65. Moreover, Mr. Weaver's own designated medical documents from Dr. Warrick indicated that on March 22, 2017, Mr. Weaver discussed past medical history including GERD and antibiotics and steroids used during the course of his treatment. Dkt. 45-7 at 1-3. As such, the Court finds that Mr. Weaver has not established an issue of material fact.

[6] Mr. Weaver testified that by the time he had the surgery, he had "tumors" in his throat. Dkt. 37-4 at 24-25. He based this conclusion on a medical bill he received after the surgery. *Id.* In his designated documents, this appears to be a diagnostic or billing code, "Laryngoscopy, direct, operative, with excision of tumor and/or stripping of vocal cords or epiglottis." Dkt. 45-2 at 1. Mr. Weaver has produced no evidence, and the Court finds none in the record, that he had tumors in his throat. In their reply, the defendants state that Dr. Talbot explained to Mr. Weaver on September 7, 2018, that the procedure involved the reshaping of his ptotic epiglottis and "excess tissue was removed in order to create an airtight seal." Dkt. 46 at 11.

[7] In his second deposition, Mr. Weaver testified that Dr. Warrick stated that there was paperwork and procedures to go through to get surgery approved. Dkt. 37-4 at 35.

surgery. Mr. Weaver testified that he "felt like I should have had that surgery as the ENT specialist stated," and Dr. Talbot was not "supposed to go against a specialist[.]" *Id.* at 48-49.

Mr. Weaver is not entitled to demand specific care such as specific testing or surgery, or to be seen by an outside provider, or even to receive the best care possible. As evidenced in the medical record, Dr. Talbot exercised his professional judgment in assessing Mr. Weaver's medical issues. The record, as discussed above, lays out an extensive treatment history by Dr. Talbot inclusive of OPRs for a tonsillectomy evaluation, prescription medications to manage GERD symptoms, review of Mr. Weaver's laryngoscopy and VFSS test results, a phone consultation with Dr. Warrick to discuss surgical intervention and more alternative conservative options based upon test results, a finite-term trial of PPI medication with the intent to re-evaluate Mr. Weaver's condition if symptoms were not resolved, prescription medication for potential allergy to the PPI, chest x-rays, OPRs for additional assessments by Dr. Warrick, PFTs, a pH probe test, discontinuation of a beta blocker that could be the source of symptoms, and finally off-site surgery.

Once Mr. Weaver returned from surgery, Dr. Talbot continued to provide treatment inclusive of a finite-term of a pureed diet, post-op pain medication, referral for a second laryngoscopy, an OPR for a neck CT scan, and a final OPR for a tonsillectomy. Based on these facts, no reasonable fact-finder could find that Dr. Talbot ignored Mr. Weaver's condition or failed to provide adequate treatment. Simply because medical intervention may take some trial and error to rule out other diagnoses or causes of symptoms, or the development of a condition may take time to rise to a level of surgical intervention, does not indicate that Dr. Talbot was not exercising his medical judgment or that he was deliberately indifferent to Mr. Weaver's condition. The Court does not find that Dr. Talbot engaged in continued ineffective treatment; rather, the treatment plan progressed.

Dr. Talbot attested that "Mr. Weaver was referred to Dr. Warrick, who indeed noted the presence of ptotic epiglottis, but after weighing the risks and benefits of surgical intervention, recommended that Mr. Weaver's GERD be managed on-site." Dkt. 37-1, ¶ 46. Dr. Talbot then "referred back to Dr. Warrick for additional assessments, and diagnostic testing," and attested that in his professional judgment, when a patient should be sent off-site to a specialist, he submits OPRs. *Id.* Mr. Weaver's contentions that Dr. Talbot did not adhere to the specialist's recommendations, or that he engaged in easier or less efficacious treatment absent medical judgment, is not evidenced by the medical record. Dr. Talbot consulted with Dr. Warrick and followed the specialist's recommendations regarding alternative treatment, necessary testing, and advisement about appropriateness of surgical intervention. When Mr. Weaver's symptoms persisted, Dr. Talbot again provided referral to a specialist for more aggressive treatment.

The defendants argue that in total, Mr. Weaver "received an incredible amount of medical attention in a concerted effort to address his concerns," and he was "afforded progressive care" which resulted in a corrective surgery of his epiglottis in 2018. Dkt. 36 at 21. The Court agrees, and notes that upon Mr. Weaver's last encounter with Dr. Talbot, further referral was submitted for re-evaluation regarding a tonsillectomy. Though Mr. Weaver wanted the timing of his surgery to be faster and wanted additional surgery of a tonsillectomy, he was not entitled to demand specific care.

Because no reasonable juror could find that Dr. Talbot was deliberately indifferent to Mr. Weaver's medical needs, he is entitled to summary judgment as a matter of law.

### B. Wexford Policy and Practice Claim

Wexford is "treated the same as a municipality for liability purposes under § 1983." *See Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010) (holding that a corporation that contracted

with a jail to provide health services is "treated the same as municipalities for liability purposes in a § 1983 action"). Thus, to hold a private corporation liable under § 1983, a plaintiff must establish that the alleged "constitutional violation was caused by an unconstitutional policy or custom of the corporation itself." *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014). If a plaintiff provides "no evidence of an unconstitutional policy or custom of [Wexford] itself, [] precedents doom his claim against the corporation." *Id.*

As discussed above, Mr. Weaver did not suffer any constitutional violation with respect to his medical treatment; thus, Wexford cannot be held liable for maintaining an unconstitutional policy or practice. *Shields*, 746 F.3d at 789. Accordingly, Wexford is entitled to summary judgment as a matter of law.

### C. Breach of Contract Claim

Mr. Weaver's claim that Wexford breached its contract with Indiana to provide adequate medical services to inmates is governed by Indiana law. It is well settled that "[t]he parties to a contract are the ones to complain of a breach, and if they are satisfied with the disposition which has been made of it and of all claims under it, a third-party has no right to insist that it has been broken*." Harold v. McComb & Son, Inc. v. JP Morgan Chase Bank*, 892 N.E.2d 1255, 1258 (Ind. Ct. App. 2008) (internal quotation omitted). There is no evidence in the record that the State of Indiana is not satisfied with Wexford's contract performance.

Mr. Weaver contends that he is an intended third-party beneficiary under the Wexford contract. The Indiana Supreme Court has explained the circumstances under which a third-party to a contract may sue to enforce the contract:

> To be enforceable, it must clearly appear that it was the purpose or a purpose of the contract to impose an obligation on one of the contracting parties in favor of the third party. It is not enough that performance of the contract would be of benefit to the third party. It must appear that it was the intention of one of the parties to require

15

>performance of some part of it in favor of such third party and for his benefit, and that the other party to the agreement intended to assume the obligation thus imposed. The intent of the contracting parties to bestow rights upon a third party must affirmatively appear from the language of the instrument when properly interpreted and construed.

*Cain v. Griffin*, 849 N.E.2d 507, 514 (Ind. 2006) (internal quotation omitted). A third-party beneficiary must show the following:

>(1) A clear intent by the actual parties to the contract to benefit the third party;
>
>(2) A duty imposed on one of the contracting parties in favor of the third party; and
>
>(3) Performance of the contract terms is necessary to render the third party a direct benefit intended by the parties to the contract.

*Eckman v. Green*, 869 N.E.2d 493, 496 (Ind. Ct. App. 2007). "The intent to benefit the third-party is the controlling factor and may be shown by specifically naming the third-party or by other evidence." *Id*. The Wexford and IDOC contract explicitly states that "[t]he parties do not intend to create in any other individual entity, inmate or patient, the status of third party beneficiary, and this Contract shall not be construed to create such status." *See* dkt. 37-2 at 104.

Mr. Weaver cannot make the requisite showing that he is an intended third-party beneficiary of the contract between Wexford and the State of Indiana. Without such a showing, his breach of contract claim fails. Moreover, this Court's ruling in *Harper v. Corizon Health Inc., et al.*, found that the contract between Corizon (Wexford's predecessor), and Indiana only mentioned inmates in the first line of the agreement which was "not an affirmative statement of any intent to bestow rights upon the inmates at IDOC. Nor is there an affirmative statement in any part of the contract to show an intent to bestow rights on the inmates." *See* No. 2:17-cv-00228-JMS-DLP, 2018 WL 6019595 at *9-10 (S.D. Ind. Nov. 16, 2018) (There was no legal intent to benefit and confer rights on IDOC inmates in the contract; thus, plaintiff had "no legal standing to complain because he is not a third party beneficiary to the contract.").

Mr. Weaver lacks standing to bring a breach of contract claim. Accordingly, Wexford is entitled to summary judgment on this claim.

### IV. Plaintiff's Motion to Correct Response [Dkt. 47]

In their reply, the defendants argue that Mr. Weaver's designated materials "do not constitute admissible evidence," and thus, he has failed to rebut any fact asserted by the defendants. Dkt. 46 at 10. The defendants argue that Mr. Weaver provided a "hodgepodge of medical records" with no bates numbers, records allegedly from Dr. Warrick's office, pages from medical textbooks, and unverified records that were not produced by the defendants. *Id.*

The defendants further state that "[n]otwithstanding the inadmissibility of Plaintiff's proffered documents, however, such documents offer nothing which suggests that Plaintiff can satisfy the subjective component of the deliberate indifference inquiry." *Id.* Mr. Weaver filed a motion to correct his response but states that what he has provided "is accurate" and all evidence is from his medical file. Dkt. 47 at 1.

As the Court has discussed, Mr. Weaver has not shown that Dr. Talbot was deliberately indifferent to his medical condition, and the Court has reviewed these filings. Accordingly, Mr. Weaver's motion to correct response, dkt. [47], is **denied as moot**.

### V. Conclusion

For the reasons explained above, the defendants' motion for summary judgment, dkt. [35], is **granted**. Mr. Weaver's motion to correct response, dkt. [47], is **denied as moot**.

Judgment consistent with this Order shall now issue.

**IT IS SO ORDERED.**

Date: 3/29/2021

*Sarah Evans Barker*

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

DONALD E. WEAVER, JR.
935351
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Inmate Mail/Parcels
4490 West Reformatory Road
PENDLETON, IN 46064

Douglass R. Bitner
KATZ  KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com